**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**
**CENTRAL ISLIP DIVISION**

| | |
|---|---|
| **FLEET CONNECT SOLUTIONS LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**VEHICLE TRACKING SOLUTIONS, LLC d/b/a INTELLISHIFT,**<br><br>**Defendant.** | **Civil Action No. 2:25-cv-04453 (NJC) (LGD)** |

**DEFENDANT'S OPENING *MARKMAN* BRIEF**

# TABLE OF CONTENTS


**I. Introduction ..... 1**

**II. Legal Principles ..... 1**

A. Claim Construction ..... 1

B. Definiteness Under 35 U.S.C. § 112(b) ..... 2

C. Enablement ..... 3

D. Means-Plus-Function Claiming ..... 4

**III. Level of ordinary skill in the art ..... 5**

**IV. The Asserted Patents and Disputed Terms ..... 5**

A. Overview of the Asserted Patents ..... 5

B. Relevant Prosecution Histories and Background ..... 9

**V. The ’586 Patent Disputed Terms ..... 11**

A. “Sy[n]chronization means for providing data to and retrieving data from remote computing resources” – claim 1” ..... 11

**VI. The ’581 Patent Disputed Terms ..... 13**

A. “handheld device” – claim 18 ..... 13

B. “means for establishing a two-way communication channel between a server and at least one handheld device located at a field geographically distant from the server” – claim 18 ..... 13

C. “means for accessing a program stored at the server to enable an assessment at the field using the at least one handheld device” – claim 18 ..... 15

D. “means for managing data collected at the field using the at least one handheld device responsive to program” – claim 18 ..... 16

E. “means for determining a geographic location of the at least one handheld device” – claim 18 ..... 17

F. “means for enabling communicating the data collected at the field and the geographic location of the at least one handheld device between the at least one handheld device and other devices or the server” – claim 18 ..... 18

G. “means for enabling the at least one handheld device to identify service schedule requirements” – claim 21 ..... 19

H. “means for enabling synchronization of a service schedule on the at least one handheld device with inventory data stored in the server” – claim 22 ..... 19

I. “a field geographically distant from the server” - claim 18 ..... 20

**VII. The ’751 Patent Disputed Terms ..... 21**

A. “navigable directions” - claim 1 ..... 21

B. "said positioning module" - claim 2 .......... 22

C. "a user interface adapted for enabling the user to interact with…said programming instructions" – claim 1 .......... 23

D. "a positioning and navigational means for determining the handheld data management device location and providing navigable directions to the user of the handheld data management device on a map, thereby enabling the user to find a field location" – claim 1 .......... 23

**VIII. The '837 Patent Disputed Terms .......... 24**

A. "the time-of-arrival bounds" – claim 1 .......... 24

B. "a metric of said user's speed" – claim 3 .......... 26

**IX. The '968 Patent Disputed Terms .......... 28**

A. "master portable device" / "master device" - claim 1 .......... 28

B. "The method of keeping track of a group of individuals" - claim 4 .......... 30

C. "continuously generates an ETA" - claim 7 .......... 31

D. "geographical positional data" / "said geographical positions" and "a plurality of mobile devices" / "said plurality of other mobile devices" - claim 7 .......... 33

E. "code for controlling" and "code for causing" - claim 7 .......... 35

**X. The '388 Patent Disputed Terms .......... 37**

A. "means for determining a channel estimate" – claim 43 .......... 37

B. "channel estimation circuitry configured to determine a channel estimate" - claim 36 .......... 38

**XI. The '153 Patent Disputed Terms .......... 39**

A. "an SVD performer" – claim 28 .......... 39

**XII. Conclusion .......... 40**

## TABLE OF AUTHORITIES

### Cases

*Aristocrat Techs. Australia Pty Ltd. vs. Int'l Game Tech.*
521 F.3d 1328 (Fed. Cir. 2008)........................................ 18, 36

*BASF Corp. v. Johnson Matthey Inc.*
875 F.3d 1360 (Fed. Cir. 2017)........................................ 3

*Blackboard, Inc. v. Desire2Learn, Inc.*
574 F.3d 1371 (Fed. Cir. 2009)........................................ 36

*Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*
813 F. App'x 522 (Fed. Cir. 2020) ........................................ 22

*Datamize, LLC v. Plumtree Software, Inc.*
417 F.3d 1342 (Fed. Cir. 2005)........................................ 3

*Dealertrack, Inc. v. Huber*
674 F.3d 1315 (Fed. Cir. 2012)........................................ 14

*Default Proof Credit Card Sys. v. Home Depot U.S.A. Inc.*
412 F.3d 1291 (Fed. Cir. 2005)........................................ 4

*Dow Chem. Co. v. Nova Chemicals Corp. (Canada)*
803 F.3d 620 (Fed. Cir. 2015)........................................ 25

*Dyfan, LLC v. Target Corp.*
28 F.4th 1360 (Fed. Cir. 2022) ........................................ 4

*Energizer Holdings, Inc. v. International Trade Commission*
435 F.3d 1366 (Fed. Cir. 2006)........................................ 27, 29

*EON Corp. IP Holdings LLC v. Silver Spring Networks Inc.*
815 F.3d 1314 (Fed. Cir. 2016)........................................ 13

*FS.com Inc. v. Int'l Trade Comm'n*
65 F.4th 1373 (Fed. Cir. 2023) ........................................ 3

*H-W Tech., L.C. v. Overstock.com, Inc.*
758 F.3d 1329 (Fed. Cir. 2014)........................................ 27, 31

*HZNP Medicines LLC v. Actavis Laboratories UT, Inc.*
940 F.3d 680 (Fed. Cir. 2019)........................................ 3

*Immervision, Inc. v. Apple Inc.*
819 F. Supp. 3d 338 (D. Del. 2026)....................................................................................38

*In re Hyatt*
708 F.2d 712 (Fed. Cir. 1983)...........................................................................................37

*In re Wands*
858 F.2d 731 (Fed. Cir. 1988)...........................................................................................32

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*
381 F.3d 1111 (Fed. Cir. 2004)...........................................................................................1

*Interval Licensing LLC v. AOL, Inc.*
766 F.3d 1364 (Fed. Cir. 2014)................................................................................3, 28, 33

*Joy MM Delaware, Inc. v. Cincinnati Mine Mach., Co.*
497 F. App'x 970 (Fed. Cir. 2012) .....................................................................................21

*MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*
687 F.3d 1377 (Fed. Cir. 2012)...........................................................................................3

*Markman v. Westview Instruments, Inc.*
52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996) ..................................1

*Masco Corp. v. United States*
303 F.3d 1316 (Fed. Cir. 2002)...........................................................................................4

*Nautilus, Inc. v. Biosig Instruments, Inc.*
572 U.S. 898 (2014)..........................................................................................2, 28, 29, 33, 34

*Noah Sys., Inc. v. Intuit Inc.*
675 F.3d 1302 (Fed. Cir. 2012)...........................................................................................5

*Novo Indus., L.P. v. Micro Molds Corp.*
350 F.3d 1348 (Fed. Cir. 2003)...........................................................................................27

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*
521 F.3d 1351 (Fed. Cir. 2008)...........................................................................................2

*Phillips v. AWH Corp.*
415 F.3d 1312 (Fed. Cir. 2005)........................................................................................1, 2

*Tehrani v. Hamilton Med., Inc.*
331 F.3d 1355 (Fed. Cir. 2003)...........................................................................................18

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*
789 F.3d 1335 (Fed. Cir. 2015)........................................................................................ 25

*Watts v. XL Sys., Inc.*
232 F.3d 877 (Fed. Cir. 2000)............................................................................................ 4

*Williamson v. Citrix Online, LLC*
792 F.3d 1339 (Fed. Cir. 2015) (en banc).................................................................. 4, 12, 35, 39

*WMS Gaming Inc. v. Int'l Game Tech.*
184 F.3d 1339 (Fed. Cir. 1999)........................................................................................... 5

**Statutes**

35 U.S.C. § 112(b) ............................................................................................................ 2
35 U.S.C. § 112(f)............................................................................................................... 4

# TABLE OF ABBREVIATIONS

| Term | Abbreviation |
|---|---|
| U.S. Patent No. 6,961,586 | ’586 Patent |
| U.S. Patent No. 8,494,581 | ’581 Patent |
| U.S. Patent No. 7,593,751 | ’751 Patent |
| U.S. Patent No. 7,206,837 | ’837 Patent |
| U.S. Patent No. 7,741,968 | ’968 Patent |
| U.S. Patent No. 7,742,388 | ’388 Patent |
| U.S. Patent No. 7,260,153 | ’153 Patent |
| Declaration of Dr. Zygmunt Haas | Haas Decl. |
| Declaration of Mr. David Williams | Williams Decl. |
| Person of ordinary skill in the art | POSITA |

## I. Introduction

The parties dispute roughly 25 terms, yet Plaintiff contends that most should be accorded their plain meaning. In many instances, the plain meaning will lead to jury confusion and will not resolve the parties' dispute. In other instances, Plaintiff attempts to simply swap one ambiguous term for another, ignoring the intrinsic record, including clear disavowals made in the specification or during prosecution. With regard to many of the means-plus-function terms, Plaintiff does not identify any algorithm or structure sufficient to achieve the recited function.

## II. Legal Principles

### A. Claim Construction

Claim construction is an issue of law for courts to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Claim terms "are generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1312 (Fed. Cir. 2005) (internal quotation marks omitted). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a [POSITA] in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Id.* at 1313. A POSITA "is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field." *Id.* (internal quotation marks omitted). If the ordinary meaning of a claim is not apparent, a court may look to "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)). While claims should "be read in view of the specification," *Phillips*, 415 F.3d at 1315, courts should "avoid the danger of reading limitations from the specification into the claim." *Id.* at 1323. To avoid the danger of importing

limitations from the specification into the claims, the focus should remain on understanding how a POSITA would understand the claim terms. *Id.*

"Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean. Those sources include the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314 (internal quotation marks and citation omitted). "[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* at 1315 (internal quotation marks omitted).

"A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate *when a term has more than one 'ordinary' meaning* or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008) (emphasis added).

**B. Definiteness Under 35 U.S.C. § 112(b)**

Patent claims must particularly point out and distinctly claim the subject matter of the invention. 35 U.S.C. § 112(b). A claim viewed in light of the intrinsic evidence must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If a claim does not, the claim fails § 112(b) and is invalid as indefinite. *Id.* at 901. A claim that is simply "amenable to construction" alone "does not satisfy the statute's definiteness requirement." *Id.* Indefiniteness is determined from the view of a POSITA at the time the application for the patent was filed. *Id.* at 911. The failure of any claim to

comply with § 112(b) must be shown by clear and convincing evidence. *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017).

The standard "must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014). "A claim is indefinite if its language might mean several different things and no informed and confident choice is available among the contending definitions." *HZNP Medicines LLC v. Actavis Laboratories UT, Inc.*, 940 F.3d 680, 698 (Fed. Cir. 2019) (internal quotation marks omitted).

### C. Enablement

To satisfy the enablement requirement, "the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation." *FS.com Inc. v. Int'l Trade Comm'n*, 65 F.4th 1373, 1375 (Fed. Cir. 2023) (internal quotation marks omitted). Enablement serves the purpose of ensuring adequate disclosure of the claimed invention and of preventing claims broader than the disclosed invention. *See MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377, 1380-81 (Fed. Cir. 2012). The Federal Circuit has stated that "a patentee chooses broad claim language at the peril of losing any claim that cannot be enabled across its full scope of coverage. The scope of the claims must be less than or equal to the scope of the enablement to ensure that the public knowledge is enriched by the patent specification to a degree at least commensurate with the scope of the claims." *Id.* at 1381 (internal quotation marks omitted). "A party must prove invalidity based on nonenablement by clear and convincing evidence." *Id.* at 1380.

**D. Means-Plus-Function Claiming**

Functional language may be used when writing a patent term or claim directed to a combination of elements. *See* 35 U.S.C. § 112(f);[1] *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347-49 (Fed. Cir. 2015) (en banc). Specifically, §112(f) allows a structure to be claimed as a "means … for performing a specified function" and an act to be claimed as a "step for performing a specified function." *Masco Corp. v. United States*, 303 F.3d 1316, 1326 (Fed. Cir. 2002). There is a rebuttable presumption that § 112(f) applies when the claim language includes "means" or "step for" terms, and that it does not apply in the absence of those terms. *Williamson*, 792 F.3d at 1348. "When a claim term lacks the word 'means, the presumption can be overcome and §112, para. 6 will apply if the challenger demonstrates that the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Id.* at 1349 (quoting *Watts v. XL Sys., Inc*., 232 F.3d 877, 880 (Fed. Cir. 2000)). When §112(f) applies, it limits the scope of the functional term "to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson*, 792 F.3d at 1347. A "structure disclosed in the specification qualifies as 'corresponding structure' if the intrinsic evidence clearly links or associates that structure to the function recited in the claim." *Id.* at 1352. The corresponding structure "must include all structure that actually performs the recited function." *Default Proof Credit Card Sys. v. Home Depot U.S.A. Inc*., 412 F.3d 1291, 1298 (Fed. Cir. 2005).

For §112, ¶6 limitations implemented by a programmed general-purpose computer or microprocessor, the corresponding structure described in the patent specification must include an

[1] Prior to the AIA, means-plus-function claiming was codified in 35 U.S.C. §112, ¶6. The AIA version of §112, ¶6 has no substantial differences as compared to §112, ¶6. *See, e.g., Dyfan, LLC v. Target Corp*., 28 F.4th 1360, 1365 (Fed. Cir. 2022).

algorithm for performing the function. *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). Computer-implemented means-plus-function claims are indefinite unless the specification discloses an algorithm to perform the function associated with the limitation. *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1319 (Fed. Cir. 2012).

## III. Level of ordinary skill in the art

A person of ordinary skill in the art (a "POSITA") for the '586, '581, '751, '837, and '968 Patents would have a bachelor's degree in computer science or electrical engineering or an equivalent area, as well as approximately 1-2 years of work experience in the design, testing, or operation of location-based services. Williams Decl. at ¶¶ 27-29. A POSITA for the '153 and '388 Patents would have a master's degree in electrical engineering or an equivalent area, as well as approximately 4-5 years of work experience in the design, testing, or operation of wireless communication and mobile systems. Haas Decl. at ¶¶ 25-27. However, a POSITA might have fewer years of work experience in the field if they had additional education. For example, someone with additional education in location-based services, such as a master's degree or doctorate, would also qualify as a POSITA (and may exceed those qualifications). Additionally, a POSITA might have less education, but greater experience, either quantitatively or qualitatively, in payment systems and would also quality as a POSITA.

## IV. The Asserted Patents and Disputed Terms

### A. Overview of the Asserted Patents

The '586 Patent describes systems and methods for conducting field assessments using handheld data management devices. It purports to address limited access to industry-specific programs, guidance, and up-to-date data during field assessments. '586 Patent, Abstract. The system provides handheld access to industry-specific assessment programs, templates, and data, with two-way communication to remote computing resources. *Id.* at 3:20-55. Handheld devices

synchronize field data with servers via wireless radio, infrared, or wired connections like modems and cradles and two-way communications enable real-time access to remote programs, assistance, and information during assessments. *Id.* at 5:52-67. The handheld includes memory, microprocessor, user interface with display and controls, speaker, and I/O controllers. *Id.*

The ’581 Patent describes a system and method for managing mobile field assets. ’581 Patent, 1:23-31. The system includes an enterprise computing device (*i.e.*, a remote server) and a handheld device employing a communication module and a position module. ’581 Patent, 6:21-23, 6:51-55, 7:54-67. The handheld device uses a network to enable “[r]eal time communications” with the computing device for “real-time access to remote programs, assistance and/or information related to [] field operations[,] and asset (personnel and inventory) resource management.” *Id.* at Abstract. As disclosed with regard to Figure 6, field crew personnel can use handheld device 10/10’ to access remote management system 58, which can “provide instructions (e.g., templates, task/punch lists) and/or programs to a group of users.” *Id.* at 7:35-36. The programs are “centrally stored within one or more databases 61/59” and are directly accessible to the handheld device 10/10’ over the network 55 or indirectly accessible through the remote management system 58. *Id.* at 7:38-41.

The ’751 Patent is directed to handheld data management devices enabling field assessments across industries. It purports to address lack of access for field personnel to industry-specific programs, guidance, and up-to-date information while on site. ’751 Patent, Abstract. The system provides handheld devices with industry-specific programs, data synchronization, and two-way communications with remote servers and personnel. *Id.* at 3:50-65. Handheld components include memory, microprocessor, display with UI, I/O controllers, speaker, modem, wireless communication module, and optional infrared link. *Id.* at 5:55-67. Wireless connectivity

encompasses CDPD, GSM/PCS, CDMA/TDMA, GPRS, Bluetooth, WAP/XML-based Internet access. *Id*. at 2:12-40. The device supports client/server interactions for real-time data exchange, remote analysis, and access to third-party Internet resources.

The ’837 Patent is directed to “methods of providing trip status information periodically to a user in transit to a destination.” ’837 Patent, Abstract. As part of this trip status information, the patent describes the estimation of “various time-of-arrival metrics, such as expected time-of-arrival and earliest-time-of-arrival.” *Id*. “The estimates are based on a plurality of data, including calendrical time (the time and date), historical statistics, average speed, current weather, weather forecasts, current traffic, and traffic forecasts.” *Id*.

The ’968 Patent is directed to a master portable device to track and display the geographic positions of a selected group of target portable devices and send convergence navigation instructions with ETAs. ’968 Patent, Abstract. Devices can be mobile phones or other portable devices with location capability derived from GPS, cellular triangulation, third-party sources, or user input. *Id*. at 3:6-15. The master device establishes permissions and communication links to targets, exchanges positional data over data networks, and may bypass traditional call setup using stored codes. *Id*. at 1:45-60. The system supports continuous or periodic updates of a sender’s location to receivers, and receivers can return navigation instructions including turn-by-turn guidance. *Id*. When devices are converging, the receiving device can compute and present ETA for the sender and optionally display both parties’ positions. *Id*. at 5:12-21. A master device can manage multiple targets, storing each target’s GPS data, and provide individual navigation instructions to facilitate group coordination. *Id*. at 6:21-27. Navigation instructions may be generated remotely based on the sender’s location and delivered audibly or visually to the sender’s

device. *Id*. at 4:22-30. Destination data, including coordinates or addresses, can be injected directly into a device's navigation system, including via dialing or preloaded data. *Id*. at 4:66-5:5.

The '388 Patent purports to describe and claim various methods, systems, and apparatuses for increasing the data rate of a packet transmission in a digital communication system. The '388 Patent allegedly does so by increasing a standard size packet by adding subcarriers to the packet to produce an extended signal and a receiver for detecting the added subcarriers. '388 Patent, 2:14-26. The '388 Patent claims recite in particular a method that uses a preamble at the beginning of the packet allowing for detection and synchronization before the data is transmitted. The preamble includes a first training symbol sequentially followed by a second training symbol that has a quantity of subcarriers greater than the first training symbol.

The '153 Patent is directed to Multi Input Multi Output (MIMO) 2-way Wireless Communications Systems where Multiple Antenna Arrays (MMA) are used in the communication devices. In MIMO 2-way communications systems, a problem with cross talk can arise because multiple antennas are transmitting and receiving at the same time. In particular, the '153 Patent allegedly provides methods and systems for reducing crosstalk interference in multiple antenna systems. The crosstalk problem occurs because transmissions across one communication channel (transmitter to receiver antenna) can interfere with communications sent and received over a different channel. '153 Patent, 3:58-4:18. The '153 Patent contends that current MMA schemes which assume that the propagation channel matrix is perfectly estimated during a so-called Channel Training Stage are generally not valid. *Id*. at 2:35-47, 3:44-49, 3:58-59. The '153 Patent purports to address the crosstalk problem by using Pre-Equalizer operators to transform a "Bad" channel into a "Good" channel so that the loss incurred in transformation is minimal. *Id*. at 4:32-58.

### B. Relevant Prosecution Histories and Background

The ’586 Patent was filed September 17, 2001, claiming priority to U.S. Provisional No. 60/233,120 filed September 18, 2000. In prosecution, the applicant stated “[w]hat is novel about Applicants’ invention are the new uses for what at the time of their application filing was new hardware and communications technology with limited data management functions.” Declaration of Thomas J. Gohn (“Gohn Decl.”), Ex. 1 at pg. 15 of Applicant response dated June 21, 2004. The Applicant admitted “[a]pplicants realized that wireless data management devices and wireless communications systems were known in the art when developing their invention.” *Id.*

The ’581 Patent was filed on August 25, 2009, as U.S. Patent Application No. 12/547,363. Its earliest claimed priority date is September 18, 2000. *See* ’581 Patent. In responding to the Office’s only prior art rejection (Gohn Decl., Ex. 2, Office Action at pgs. 3-12), the Applicant amended claim 1 (then claim 21) as follows to clarify that the handheld device accesses a remote assessment program: “using a handheld device to access an assessment program stored in a memory of a computing device located geographically remote from the handheld device.” *Id.* at pg. 2 of Application response dated June 21, 2012 (underlining reflects amended language). The Applicant distinguished this step by arguing that accessing a remote program is different than accessing a remote database: “[t]he distinction is between accessing an assessment program and accessing a database storing data.” *Id.* at 9.

The ’837 Patent was filed November 4, 2002 and does not claim priority to any other patent application or provisional. *See* ’837 Patent. As filed, claim 1 recited “[a] method for providing status information to *a user* of a mobile communications device, wherein *said user* is in transit to a destination,” comprising receiving a location, estimating “at least one *time-of-arrival metric*” based on the location, “a calendrical time at said location, *a mode of travel*,” and at least one historical travel time statistic, and “sending *a signal*” based on the metrics.

The USPTO rejected the claims on January 21, 2004 over U.S. Patent No. 6,317,686 to Ran ("Ran") and U.S. Patent No. 5,987,377 to Westerlage ("Westerlage"). Gohn Decl., Ex. 3, Office Action. In doing so, the Examiner found that Westerlage disclosed the "time-of-arrival bounds for a confidence interval" limitation. In particular, Westerlage taught that a dispatch "can configure the interval" at which arrival times are calculated. In other words, a reporting interval measured in time, not a statistical confidence interval. In response, the applicant's May 11, 2004 amendment rewrote claim 1 to delete the user, the calendrical time, and the mode of travel. *Id*. at pgs. 2-3 of Applicant response dated May 11, 2004. These limitations were replaced with "the time-of-arrival bounds . . . for a confidence interval," moving this limitation from dependent claim 2. *Id*. The amendments also replaced "a signal" with "the time-of-arrival bounds." Issued claim 3 still recites "said user's speed," referring to limitations that the amendment deleted from claim 1.

The applicant distinguished Ran on the ground that "[n]owhere does Ran teach . . . estimating and sending the time-of-arrival bounds for a confidence interval," illustrating the point with a 95% confidence interval example. *Id*. at 4. After a final rejection mailed August 30, 2004 over U.S. Patent No. 6,006,159 to Schmier ("Schmier"), the applicant pressed the same distinction, again with a 95% example. *Id*. at pgs. 4-5 of Applicant response dated October 27, 2004. After an appeal to the Board of Patent Appeals and Interferences ("Board") the Notice of Allowability issued expressly in response to the Board's reversal. Claims 1 and 3-7 were allowed and renumbered as issued claims 1 through 6. At no point did the applicant, the Examiner, or the Board identify what confidence interval the claim requires.

The '968 Patent is a divisional of U.S. Patent Application No. 11/200,730. *See* '968 Patent. The prosecution history of the application that led to the '968 Patent is the origin of nearly every defect addressed below. The USPTO rejected claims 47-52 under 35 U.S.C. § 101 on September

9, 2009, because "[t]he claims are directed to 'An application' which is purely software." Gohn Decl., Ex. 4, Office Action. In response, the applicant rewrote the claims as a "computer readable medium" bearing "code for" each previously recited function, explaining that "in the interest of obtaining an allowance, Applicant has amended claims 47-52 to include a positive recitation of the code that controls the application," and argued for claim 52 that "[n]othing in the cited reference even hints at the generation of an ETA." *Id.* at pg. 7 of Applicant response dated September 21, 2009. The USPTO's action rejected the remaining claims over U.S. Publication No. 2004/0021569 to Lepkofker ("Lepkofker") and U.S. Patent No. 5,905,459 to Kim ("Kim") but *objected* to claim 52 as containing allowable subject matter. *Id.* at Office Action dated October 29, 2009. The Notice of Allowability issued one week later, with the examiner's reasons for allowance resting on the combination of a "master portable device" transmitting "convergence instructions" and "including ETAs between the target devices and the master device." *Id.* at Notice of Allowability. Allowed claims 24, 26, 27, 43, and 45-50 were renumbered as issued claims 1-10.

The '388 Patent claims priority to U.S. Provisional Patent Application No. 60/589,158. *See* '388 Patent. The '388 Patent has been subject to two reexaminations, Reexam Nos. 90/019,840 and 90/019,766. In each of these, numerous claims have been cancelled, including six of the eight claims being asserted against Defendant in this case.

## V. The '586 Patent Disputed Terms

### A. "Sy[n]chronization means for providing data to and retrieving data from remote computing resources" – claim 1"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Subject to construction under 35 U.S.C. § 112(f):<br><br>**Function**: providing data to and retrieving data from remote computing resources | This term should be construed in accordance with 35 U.S.C. § 112, ¶ 6 and applicable case law.<br>**Function**:<br>providing data to and retrieving data from remote computing resources |

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| **Structure**: The integrated communication module 42, infrared communications link 38, integrated modem 40, position module 46, the handheld data management device 10, and server 58 provide the structures for data synchronization, as taught in the specification and understood by one skilled in the art (see '586 patent: Abstract, 3:21-4:35, 5:14-7:23, 8:4-23, 10:32-11:62, Figs. 1-4, 9, Fig. 11). | **Structure**:<br>wireless modem and/or cellular wireless transmitter |

Defendant's proposed construction closely follows the recited structure in the '586 Patent's specification. "Structure disclosed in the specification qualifies as 'corresponding structure' if the intrinsic evidence clearly links or associates that structure to the function recited in the claim. *Williamson*, 792 F.3d at 1352. When discussing the synchronization function, the '586 Patent states "[i]t is another aspect of the present invention to provide methods for field assessment data synchronization and/or delivery using wireless capabilities resident in handheld personal computing devices." '586 Patent, 3:28-32. Further, the '586 Patent makes clear that the synchronization "is enabled using wireless capabilities resident in handheld personal computing devices." '586 Patent, Abstract. Defendant's construction captures this disclosure as the only supported structure concerning "providing data to and retrieving data from remote computing resources."

Plaintiff's construction should be rejected as it recites a multitude of alleged structures that do not provide actual structural recitations (such as the various "modules") and/or are not relevant to the recited function (such as the position module 46 being irrelevant to the "providing data to and retrieving data from remote computing resources" function). Plaintiff's construction is overbroad and would not provide clarity to the jury, as the "modules" are not structural components and are not linked with the synchronization function.

## VI. The ’581 Patent Disputed Terms

### A. “handheld device” – claim 18

| Plaintiff’s Proposed Construction | Defendant’s Proposed Construction |
|---|---|
| No construction necessary. | “a device sized to substantially fit within the palm of a user’s hand” |

All intrinsic evidence supports Defendant’s construction. The specification describes the handheld device consistently with the requirement that it must be held in a user’s hand: “The device 10 includes an outer housing 12 sufficiently small to be easily portable such that it substantially fit[s] within the palm of a user[’]s hand . . . .” ’581 Patent, 5:58-60. The Court should construe the term because its plain meaning does not resolve the parties’ dispute - plain meaning does not determine what weight should be accorded to “handheld.” *See EON Corp. IP Holdings LLC v. Silver Spring Networks Inc*., 815 F.3d 1314, 1319-20 (Fed. Cir. 2016) (“By determining only that the terms should be given their plain and ordinary meaning, the court left this question of claim scope unanswered, leaving it for the jury to decide. This was legal error.”).

The ’581 Patent even acknowledges that “[c]urrently, handheld data management devices such as PDAs or *Palm* PCs can have as much computing power as some desktop personal computers.” ’581 Patent, 2:13-16 (emphasis added). The ’581 Patent clearly contemplates using these same handheld devices for field assessments. ’581 Patent, 3:45-47 (“It is an object of the present invention to provide a system and methods for managing asset in the field (e.g., personnel, equipment and/or inventory) via handheld devices.”

### B. “means for establishing a two-way communication channel between a server and at least one handheld device located at a field geographically distant from the server” – claim 18

| Plaintiff’s Proposed Construction | Defendant’s Proposed Construction |
|---|---|
| Subject to 35 U.S.C. §112(6)<br>**Function**: establishing a two-way communication channel between a server and | This term should be construed in accordance with 35 U.S.C. § 112, ¶ 6 and applicable case law. |

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| at least one handheld device located at a field geographically distant from the server<br>**Structure/Algorithm**: The integrated communication module 42, infrared communications link 38, integrated modem 40, and server 58 provide the structures for two-way communication, as taught in the specification and understood by one skilled in the art (see '581 patent: Abstract, 2:22-3:7, 3:45-4:55, 5:29-8:58, 8:59-13:34, FIG. 1-13). | **Function**:<br>establishing a two-way communication channel between a server and at least one handheld device located at a field geographically distant from the server<br>**Structure**:<br>wireless modem and/or cellular wireless transmitter |

The Court should adopt Defendant's proposed construction because it aligns with how the '581 Patent specification describes a channel. The applicant chose to use means-plus-function claiming and is thus limited to the structure described in the specification that is tied to the function. The '581 Patent describes how "[t]he Code Division Multiple Access (CDMA) network is a digital wireless network that defines how a single channel can be segmented into multiple channels using a pseudo random signal (or code) to identify each users information. Because CDMA spreads each call over more than 4.4 trillion channels across the entire frequency band." '581 Patent, 2:45-50. The '581 Patent makes clear in its specification that a channel is a division of the electromagnetic frequency spectrum. *Id*. Defendant's proposed construction captures this by proposing hardware structure that allows for the establishment of a channel.

Plaintiff's proposal provides little, if any, clarity and, as with the '586 Patent, again recites the same or similar "structural" elements that it has for other unrelated claim elements. For example, it is unclear if Plaintiff is alleging the "module" element is hardware or software. If software, Plaintiff does not even bother to propose an algorithm, instead impermissibly attempting to evade the "quid pro quo" of § 112, ¶ 6. *See Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1328-29 (Fed. Cir. 2012). If hardware, Plaintiff vaguely identifies a "module" and "black box" elements

from the figures in the '581 Patent. For example, drawing elements 42, 38, and 40 are reproduced below.




FIG. 4




FIG. 3




FIG. 5

'581 Patent, Fig. 5.

These do not provide adequate structure to comply with 35 U.S.C. § 112(f). Furthermore, Plaintiff's proposed construction includes elements (e.g., a server 58) not related to the claimed function. Thus, the Court should adopt Defendant's proposed construction and reject Plaintiff's.

### C. "means for accessing a program stored at the server to enable an assessment at the field using the at least one handheld device" – claim 18

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| Subject to 35 U.S.C. §112(6)<br>**Function**: accessing a program stored at the server to enable an assessment at the field using the at least one handheld device<br>**Structure/Algorithm**: The integrated communication module 42, infrared communications link 38, integrated modem 40, and server 58 provide the structures for the handheld device to access programs on a server, as taught in the specification and understood by one skilled in the art (see '581 patent: Abstract, 2:22-3:7, 3:45-4:55, 5:29-8:58, 8:59-13:34, FIG. 1-13). | This term should be construed in accordance with 35 U.S.C. § 112, ¶ 6 and applicable case law.<br>**Function**:<br>accessing a program that is not a database stored at the server to enable an assessment at the field using the at least one handheld device<br>**Structure**:<br>processor and client software that makes a service request to a server program, the server program fulfilling the request to enable an assessment at the field using the at least one handheld device |

To obtain the '581 Patent, the applicant distinguished between a "program" - as recited in each independent claim - and a "database." Ex. 2, Applicant response dated June 21, 2012 at pgs. 8-10. The claims that issued from these arguments require "access[ing] a [] program" (claims 1,

18). This limitation cannot be met by accessing or downloading a database because the applicant excluded this from the claims. To distinguish the prior art, the applicant stated that "LeVander does not disclose accessing an assessment program stored remotely as recited. ***The distinction is between accessing an assessment program and accessing a database storing data***." *Id.* (emphasis added). Plaintiff cannot ignore these limiting arguments as this would nullify the applicant's clear disavowal.

Defendant's proposed structure follows what the applicant clearly indicated he invented. Plaintiff's proposal, however, once again recites amorphous structures, includes a "module" reference which lacks any structure, and includes structures that are not related to the claimed function. Further, Plaintiff's proposed structure is nearly identical to the structure proposed for the "synchronization means" term in the '586 Patent. This pattern is repeated below as well and belies Plaintiff's position that its proposed structure is linked to the function of each claim term.

### D. "means for managing data collected at the field using the at least one handheld device responsive to program" – claim 18

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Subject to 35 U.S.C. §112(6)<br>**Function**: managing data collected at the field using the at least one handheld device responsive to program<br>**Structure/Algorithm**: The microprocessor programmed to prompt a user to record field data using a handheld device and storing the entered data, as taught in the specification and understood by one skilled in the art (see '581 patent: Abstract, 2:22-3:7, 3:45-4:55, 5:29-8:58, 8:59-13:34, FIG. 1-13) | Indefinite |

A POSITA would not be able to ascertain Claim 18's scope with respect to this term. Williams Decl. at ¶¶ 31-33. Specifically, claim 18 references "means for accessing a program stored at the server." Yet, in the very next means-plus-function element, the handheld device is

"responsive to program." '581 Patent, 14:59-61. It is unclear: (1) if this is the program that is stored at the server; or (2) if the word "program" here is being used in such a way to describe that the handheld device <u>*can be*</u> programmed (*i.e.*, can have computer-readable code loaded onto it in order to perform a task). *Id.* at ¶ 31.

The '581 Patent even acknowledges that "computer program instructions" are used to implement functions described in the patent.

> These computer program instructions can be provided to a processor…to produce a machine, such that the instructions, which execute via the processor of the handheld device, remote computer, server or other programmable data processing apparatus, create means for implementing the functions specified in the flowchart block or blocks.

'581 Patent, 8:40-53.

Thus, not only does the '581 Patent confuse the meaning of the term "program," but a POSITA could have additional understandings as well. Williams Decl. at ¶ 33. This term is thus unclear and fails to inform a POSITA of the scope of the claim.

### E. "means for determining a geographic location of the at least one handheld device" – claim 18

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Subject to 35 U.S.C. §112(6)<br>**Function**: determining a geographic location of the at least one handheld device<br>**Structure/Algorithm**: The position module 46, navigational module, and remote server provide the structures for determining location, as taught in the specification and understood by one skilled in the art (see '581 patent: Abstract, 2:22-3:7, 3:45-4:55, 5:29-8:58, 8:59-13:34, FIG. 1-13). | This term should be construed in accordance with 35 U.S.C. § 112, ¶ 6 and applicable case law.<br>**Function**:<br>determining a geographic location of the at least one handheld device<br>**Structure**:<br>Global Positioning System (GPS) hardware and software, and/or signal triangulation hardware and software |

The Court should adopt Defendant's proposed construction for the same reasons as stated above in section VI.B. Furthermore, for this claim element, Plaintiff includes a navigational module and a remote server, neither of which relates to the claimed function.

### F. "means for enabling communicating the data collected at the field and the geographic location of the at least one handheld device between the at least one handheld device and other devices or the server" – claim 18

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Subject to 35 U.S.C. §112(6)<br>**Function:** enabling communicating the data collected at the field and the geographic location of the at least one handheld device between the at least one handheld device and other devices or the server<br>**Structure/Algorithm:** The integrated communication module 42, infrared communications link 38, integrated modem 40, position module 46, and server 58 provide the structures for communicating field data and location, as taught in the specification and understood by one skilled in the art (*see* '581 patent: Abstract, 2:22-3:7, 3:45-4:55, 5:29-8:58, 8:59-13:34, FIG. 1-13). | This term should be construed in accordance with 35 U.S.C. § 112, ¶ 6 and applicable case law.<br>**Function**:<br>enabling communicating the data collected at the field and the geographic location of the at least one handheld device between the at least one handheld device and other devices or the server<br>**Structure**:<br>software that implements the algorithm described in Fig. 13 and accompanying references in the specification, along with a processor, RAM, ROM, and wireless modem and/or cellular wireless transmitter |

The court should adopt Defendant's proposed structure for this term. Plaintiff once again attempts to use vague nonce words to describe its proposed structure. Defendant, on the other hand, proposes actual structural elements and algorithms from the specification. "[T]he corresponding structure for a § 112 ¶ 6 claim for a computer-implemented function *is the algorithm* disclosed in the specification." *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008) (citations omitted). Plaintiff's structural identification is deficient because it fails to identify a specific algorithm or actual hardware once again lists the same "module" and "link" elements that do not provide any actual structure and relies upon structures that do not relate to the claimed function. *See* Sections VI.B and VI.F, above.

The Court should not allow Plaintiff to skirt the means-plus-function requirements that the applicant chose to employ. *See Tehrani v. Hamilton Med., Inc.*, 331 F.3d 1355, 1362 (Fed. Cir. 2003) (remanding district court construction of computer-implemented means-plus-function limitation whether the district court did "not determine[] the precise algorithm that is part of the

recited structure.”). Instead, the Court should construe the claims in accordance with Defendant’s proposal.

### G. “means for enabling the at least one handheld device to identify service schedule requirements” – claim 21

| Plaintiff’s Proposed Construction | Defendant’s Proposed Construction |
|---|---|
| Subject to 35 U.S.C. §112(6)<br>**Function:** enabling the at least one handheld device to identify service schedule requirements<br>**Structure/Algorithm:** A microprocessor programmed to receive a service schedule identification from a user, as taught in the specification and understood by one skilled in the art (*see* ’581 patent: Abstract, 2:22-3:7, 3:45-4:55, 5:29-8:58, 8:59-13:34, FIG. 1-13) | This term should be construed in accordance with 35 U.S.C. § 112, ¶ 6 and applicable case law.<br>**Function**:<br>enabling the at least one handheld device to identify service schedule requirements<br>**Structure**:<br>software that allows the handheld device to access a schedule of services to be performed in the field |

The Court should adopt Defendant’s proposed construction for the same reasons as stated above in section VI.F.

### H. “means for enabling synchronization of a service schedule on the at least one handheld device with inventory data stored in the server” – claim 22

| Plaintiff’s Proposed Construction | Defendant’s Proposed Construction |
|---|---|
| Subject to 35 U.S.C. §112(6)<br>**Function:** enabling synchronization of a service schedule on the at least one handheld device with inventory data stored in the server<br>**Structure/Algorithm:** A microprocessor programmed to assesses schedule requirements and provide a user with relevant inventory availability status, as taught in the specification and understood by one skilled in the art (*see* ’581 patent: Abstract, 2:22-3:7, 3:45-4:55, 5:29-8:58, 8:59-13:34, FIG. 1-13) | This term should be construed in accordance with 35 U.S.C. § 112, ¶ 6 and applicable case law.<br>**Function**:<br>enabling synchronization of a service schedule on the at least one handheld device with inventory data stored in the server<br>**Structure**:<br>software that implements an algorithm that synchronizes inventory data stored on a server with a schedule of services to be performed in the field, along with a processor, RAM, ROM, and wireless modem and/or cellular wireless transmitter |

The Court should adopt Defendant’s proposed construction for the same reasons as stated above in section VI.F.

### I. "a field geographically distant from the server" - claim 18

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No construction necessary. | Indefinite |

A POSITA would not be able to ascertain Claim 18's scope with respect to this term. Williams Decl. at ¶¶ 34-41. The '581 Patent fails to inform what is meant by the term "geographically distant." No description is provided, and nothing claimed, that would determine if a handheld device is "geographically distant" as opposed to just "distant" from a server. No objective measurements are provided, and no baseline is given. The phrase "geographically distant" is not used anywhere in the specification and is only used once in Claim 18. A POSITA would be left guessing as to how far away a handheld device would need to be in order to practice the claimed invention of Claim 18. *Id*. at ¶ 36.

Additionally, there are multiple ways to measure geographic distance, both quantitatively and qualitatively, in context of absolute location and/or relative location and other contexts such as scope of geography and applications being used. *Id*. at ¶¶ 37-38. Relative distance measurements can also be used. This distance measured in relation to another point, object, landmark, or current position. *Id*. at ¶¶ 37-39. It is contextual and often more practical for human guidance or local maneuvers.

Further, "geographically distant" can by itself mean many things, particularly varying by context such as types of locations and/or application. *Id*. at ¶ 40. "Distant" within a building context could mean a non-adjacent room or another floor for example. In a city context, "geographically distant" might need to mean out of line-of-sight, or on a different street. *Id*. In a state or larger context, "geographically distant" could need to mean that the server IP address is physically "geographically distant" such that the IP address is in a different state (in a gambling context for example, where eligibility to gamble is based on the (U.S) state of the IP address). *Id*.

Further confusion as to the scope of this term stems from the use of the phrase "geographically remote from the handheld device" in Claim 1. A POSITA would not understand the difference between the phrase "geographically remote" and "geographically distant." *Id.* at ¶ 41. Different terms in a patent are presumed to have different meanings. *Joy MM Delaware, Inc. v. Cincinnati Mine Mach., Co.*, 497 F. App'x 970, 973 (Fed. Cir. 2012) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings") (internal quotations omitted). Yet, the difference of these terms is not explained, nor would it be understood by a POSITA.

## VII. The '751 Patent Disputed Terms

### A. "navigable directions" - claim 1

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No construction necessary. | Indefinite |

A POSITA would not be able to ascertain Claim 1's scope with respect to this term. The term "navigable directions" is used only in Claim 1. No description is provided in the specification of the '751 Patent concerning what this term means. In fact, the '751 Patent uses the term "directions" only five times. Williams Decl. at ¶¶ 42-48. For example, "[a] handheld device user can be provided with directions to a requested location, based on the user's position, either textually or through known mapping programs (e.g., Map BlastTM)." '751 Patent, 7:63-67. It is unclear if these are "navigable directions." Williams Decl. at ¶¶ 42-44. The '751 Patent further describes directions in various ways, for example, "[i]nitial instructions can include summary information regarding the problem, required equipment, and *pinpoint directions* to the assigned positions, which can be provided to operators utilizing GPS." '751 Patent, 12:5-8 (emphasis added). It is unclear what the difference is between "directions" and "pinpoint directions" or

"navigable directions." Williams Decl. at ¶¶ 42-43. A POSITA would thus not understand the scope of this claim.

Further, no objective measurements are provided, and no baseline is given. *Id*. at ¶ 44. A POSITA would be left guessing as to what constitutes navigable directions and what is required to practice the claimed invention of Claim 1. There are multiple ways to provide directions and/or to navigate between points. *Id*. at ¶ 45. "Navigable directions" can vary depending on numerous factors, including whether "absolute directions" or "relative directions" are involved, with "navigable directions" needing a sufficient amount/combination of one or the other (or hybrid) to be truly "navigable." *Id*. at ¶¶ 44-48. The '751 Patent's use of "navigable directions" is thus indefinite.

### B. "said positioning module" - claim 2

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No construction necessary. | Indefinite |

This term lacks antecedent basis and claim 2 could not be understood as a result. This term is thus indefinite. Williams Decl. at ¶¶ 49-55. A term appearing in a claim for the first time but using the modifier "said" indicates indefiniteness. *See Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*, 813 F. App'x 522, 526 (Fed. Cir. 2020) ("As an initial matter, 'said different IP Address' appears in the claim without antecedent basis. Prior to that point, the claim recites certain IP addresses, but never a 'different' one."). Neither in claim 1 nor claim 2 of the '751 Patent, is a "positioning module" recited to provide the antecedent basis for "said positioning module." Nor is this term used in the specification of the '751 Patent. A POSITA would thus be left guessing what the term is referring to, especially given that that the term "module" (used throughout the specification and claims of the '751 Patent) is absent in Claim 1 with respect to positioning or navigation.

**C. "a user interface adapted for enabling the user to interact with…said programming instructions" – claim 1**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No construction necessary. | "a user interface adapted for enabling the user to interact directly with code running on said microprocessor" |

The '751 Patent clearly delineates between a "program" and "programming instructions." *See* '751 Patent, Claim 1 ("a microprocessor for executing programs including said at least one field data management *program*, wherein execution of said program includes execution of *programming instructions*") (emphasis added). Claim 1 even delineates between "said *programming instructions*" and "said at least one field data management *program*." *Id*. (emphasis added). In its specification, the '751 Patent discusses computer program code for carrying out the claimed invention. '751 Patent, 12:50-54 ("The computer program code for carrying out operations of the present invention, however, can also be written in conventional procedural programming languages, such as the 'C' programming language.").

Defendant's construction should be adopted as it clarifies that a program and programming instructions are different, and the user interface must allow interaction with both. Further, it is apparent that the applicant knew how to claim interaction with only the field data management program (*see* '751 Patent, claims 4 and 6) thus inclusion of programming instructions language cannot be ignored.

**D. "a positioning and navigational means for determining the handheld data management device location and providing navigable directions to the user of the handheld data management device on a map, thereby enabling the user to find a field location" – claim 1**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Subject to 35 U.S.C. §112(6):<br>**Function**: determining the handheld data management device location and providing navigable directions to the user of the | This term should be construed in accordance with 35 U.S.C. § 112, ¶ 6 and applicable case law.<br>**Function**: |

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| handheld data management device on a map, thereby enabling the user to find a field location<br>**Structure**: The position module 46, navigational module, and remote server provide the structures for determining location and providing directions, as taught in the specification and understood by one skilled in the art (*see* '751 patent: 6:39-56, 7:38-67, 9:50-10:32, Fig. 5, Fig. 8). | determining the handheld data management device location and providing navigable directions to the user of the handheld data management device on a map, thereby enabling the user to find a field location<br>**Structure**:<br>a navigation module containing hardware and software such as Global Positioning System (GPS), and/or signal triangulation that can determine location and directions |

Defendant's proposed construction should be adopted as it contains structure describing this means-plus-function term and supported by the '751 Patent's specification. The '751 Patent makes clear that "[a] navigation module will include positioning and navigational capabilities." '751 Patent, 6:49-50. Defendant's construction captures both the positioning and navigational aspects of this element. On the other hand, Plaintiff's proposed construction does not provide any actual structure. Instead, Plaintiff's construction merely rehashes the elements of this claim term swapping "positioning and navigational means" for "position module" and "navigation module."

## VIII. The '837 Patent Disputed Terms

### A. "the time-of-arrival bounds" – claim 1

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No construction necessary. | Indefinite |

The term fails *Nautilus* because the bounds have no determinate identity independent of a parameter the claim never supplies. "Time-of-arrival bounds" exist only *for* a confidence interval, and the claim recites only "*a* confidence interval," which could be any specific interval. The bounds for a 50% confidence interval may differ from the bounds for a 95% interval, so the identical accused computation falls inside or outside the claim depending entirely on an unrecited variable. A POSITA asked whether a given pair of estimated times constitutes "the time-of-arrival bounds" has no way to answer, because the claim never fixes which interval defines "the" bounds.

Williams Decl. at ¶¶ 56-66. Where claim scope turns on an unstated parameter and the intrinsic record supplies no way to select it, the claim is indefinite. *Dow Chem. Co. v. Nova Chemicals Corp. (Canada)*, 803 F.3d 620, 630 (Fed. Cir. 2015) (multiple measurement approaches yielding different results, with no guidance on which to use, render the claim indefinite); *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1344 (Fed. Cir. 2015) ("molecular weight" indefinite where three possible measures were unspecified).

The term's first appearance in the claim is "estimating *the* time-of-arrival bounds." However, no bounds of any kind are previously recited. In other words, there is no antecedent basis in claim 1 for "the" time-of-arrival bounds. The specification does not cure the defect or provide any explanation that a POSITA can rely upon to determine its scope. The sole mention of the term is a passing entry in a list. '837 Patent, 3:54-57 ("Time-of-arrival metrics that might be estimated include: expected time-of-arrival, earliest time-of-arrival, time-of-arrival bounds for a given confidence interval, etc."). The specification says "a *given* confidence interval" but never provides an example interval, an algorithm for computing bounds, or even a disclosure of whether the bounds are one-sided or two-sided. Further, it discloses multiple alternative statistical frameworks, each of which would yield different bounds. *Id.* at 3:33-39 ("expected trip time and standard deviation of a normal probability distribution . . . or alternative parameters (e.g., minimum and maximum trip times, etc.) according to a different type of probability distribution."). The only numeric probability anywhere in the patent concerns a lateness alert, "a sufficiently high probability (say, 70%) of being late," *id.* at 1:62-67, which is not a confidence interval defining bounds. Williams Decl. at ¶¶ 59-60.

The prosecution history confirms that POSITA could not apply the term consistently. The term was added to claim 1 by the May 11, 2004 amendment, which replaced the original "at least

one time-of-arrival metric" to overcome Ran. Before that amendment, the Examiner had read "time-of-arrival bounds for a confidence interval" onto Westerlage's configurable *reporting* interval, the period of time between successive arrival-time calculations, although this interpretation confuses an interval of time with a statistical confidence interval. Ex 3 at pgs. 2-3 of Applicant response.

During prosecution, Applicant argued against the Examiner's rejections by explaining what a confidence interval *is*, illustrating the limitation with a 95% confidence interval. *Id.* at May 11, 2004 amendment; October 27, 2004 amendment. But this response only underscores the lack of clarity and precision of this term. Knowledge of what a confidence interval is does not reveal *which* confidence interval the claim requires. The scope of this term still varies with which confidence interval is required. And the applicant's 95% examples show that the applicant knew exactly how to specify a confidence level, but chose to recite an ambiguous term "a confidence interval" instead. The interval could be any interval, which has no clear bounds. That choice leaves competitors in the "zone of uncertainty" *Nautilus* forbids. 572 U.S. at 909-10.

**B. "a metric of said user's speed" – claim 3**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No construction necessary. | Indefinite |

"Said user" has no antecedent basis anywhere. Claim 3 depends from claim 1, and neither claim recites any "user" before the phrase "said user's speed" appears. Claim 1 is directed entirely to a "mobile communications device" and no "user" is claimed. Nor can a user be inferred with reasonable certainty, because the identity of the user materially affects scope. A device's speed and any given person's speed can differ. For example, a device left in a car, shipped in a package, or carried on a bus among dozens of passengers has a speed, but it is unclear whose speed is "said

user's." It could be, for example, the subscriber's, a person that happens to be carrying the device, or a driver. Williams Decl. at ¶¶ 67-69.

This is not an implicit antecedent case like *Energizer Holdings, Inc. v. International Trade Commission*, 435 F.3d 1366, 1370-71 (Fed. Cir. 2006), where the context provided a reasonably ascertainable meaning. In the '837 Patent prosecution history, the antecedent basis was not omitted, it was *deleted*. Original claim 1 recited "a method for providing status information to *a user* of a mobile communications device, wherein *said user* is in transit to a destination." The May 11, 2004 amendment deleted the user from claim 1 to overcome the prior art, while leaving dependent claim 4 (issued claim 3) unchanged. Issued dependent claim 3 of the '837 Patent refers to language in claim 1 that no longer exists.

That history is fatal to any judicial correction request from Plaintiff. A district court may correct a patent only where the error is evident from the face of the patent, the correction is "not subject to reasonable debate," and "the prosecution history does not suggest a different interpretation." *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003); *see also H-W Tech., L.C. v. Overstock.com, Inc.*, 758 F.3d 1329, 1333-35 (Fed. Cir. 2014). Here, restoring the deleted preamble would undo an amendment the applicant made deliberately to secure allowance. Rewriting claim 3 to refer to the device's speed would change its technical content, since the specification computes speed from the device's own positions while the claim asks for the *user's* speed. Leaving the claim as written renders the term indefinite because a "user" is not previously recited. A defect the patentee created by amendment and could have fixed at any time in the following three years of prosecution, is beyond judicial repair.

The limitation fails for a second, independent reason: "a metric of said user's speed over a time interval" has no discernible boundary in the intrinsic record. The specification never uses the

word "metric" in connection with speed. The term "metrics" is used only when referring to time-of-arrival. The only speed related disclosure is "average speed," computed either over the whole trip or as "the average speed over a recent time interval (i.e., a moving average, as is well known in the art)." '837 Patent, 4:15-22. The recited claim term is significantly broader and undefined. It is unclear whether, for example, instantaneous GPS velocity, a maximum speed, or a variance qualify as "a metric of speed over a time interval." A POSITA cannot determine with reasonable certainty whether its speed input falls within the limitation. Williams Decl. at ¶¶ 67-69. A term with no objective boundary in the intrinsic record is indefinite. *Interval Licensing*, 766 F.3d at 1370-71; *Nautilus*, 572 U.S. at 901.

## IX. The '968 Patent Disputed Terms

### A. "master portable device" / "master device" - claim 1

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No construction necessary. | Indefinite |

The term fails the clarity and precision demand of *Nautilus* for two independent reasons. First, "said master device" lacks antecedent basis. The only device the claim previously recites is "a master portable device." A POSITA cannot determine with reasonable certainty whether the displaying, sending, and ETA-generating limitations must be performed by the recited *portable* device, or whether the "master device" role in those limitations may reside elsewhere. Williams Decl. at ¶¶ 76-79. The uncertainty is material based on the intrinsic record because the specification discloses architectures in which the relevant data resides on servers. For instance, the '968 Patent specification states that "[t]he source for the data can be in one location, such as server 61 or in multiple locations, such as servers 62 and 63." '968 Patent, 6:49-54. Whether a system that displays positions and dispatches instructions from a server rather than the portable handset practices claim 1 depends entirely on which reading of the shifting "master" terms is used. The

prosecution history underscores the uncertainty. The Examiner interpreted the "master" limitations to be met by the central master control unit of the Lepkofker reference. The applicant responded not by explaining the meaning of a "master portable device," but rather by amending other limitations. It does not appear that the term was defined at any point during prosecution.

Second, "master" itself is a functional label the intrinsic record leaves without any explanation. The specification uses the word only twice outside the Abstract, and the second use eliminates the meaning of the term rather than defining it:

> Note that in process 40, the calling (or master) device established the communication links with the target devices. The system and methods discussed herein can work in the reverse or by using a combination of directional initiations or can work with the GPS data coming from a third party as discussed above.

*Id.* at 6:21-27 (emphasis added).

The specification thus equates "master" with whichever device happens to initiate communication, and then immediately teaches that the roles are reversible, and that the data may come from a third party altogether. In other places, the written description rotates among "sending," "receiving," "calling," and "target" devices with no fixed assignment. Claim 1 recites four distinct functions of the "master" (group creation, position establishment, display, and instruction sending), but the intrinsic record teaches that any device may perform any of these in either direction. A POSITA examining an accused peer-to-peer system, in which no device is consistently designated, has no way to determine with reasonable certainty which device, if any, is the "master." Williams Decl. at ¶¶ 76-79. That is precisely the "zone of uncertainty" *Nautilus* forbids. 572 U.S. at 909-10.

Plaintiff cannot dismiss the defect as tolerable shorthand under *Energizer*, 435 F.3d at 1370-71. *Energizer* excused an antecedent gap where the limitation being referred to was reasonably ascertainable from a single recited element. Here, there are multiple problems because

there are three variants of the term within a single claim, the specification defines "master" only by equating it with "calling," (Col. 6:21-27), and the specification includes an express teaching that the defining function "can work in the reverse." *Id.* The intrinsic record does not provide any clarity that eliminates the indefinite nature of these terms.

**B. "The method of keeping track of a group of individuals" - claim 4**

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No construction necessary. | Indefinite |

No preceding claim recites a method of "keeping track of a group of individuals." The only preceding independent claim, claim 1, recites a "method of tracking a plurality of portable devices." On its face, claim 4 therefore recites two structurally different readings, and the patent provides a POSITA with no way to choose between them. It is either (i) a dependent claim from which the reference claim number has been omitted, in which case it violates § 112, ¶ 4's requirement that a dependent claim "specify" the claim to which it refers, and a POSITA cannot know *which* claim's limitations it incorporates, or (ii) an independent claim whose preamble refers, with a definite article, to a method never previously defined. The choice is outcome determinative. Under the dependent reading, claim 4 (and claims 5 and 6, which depend from it) would import the requirement of claim 1 of "creating a select group" and "master portable device" limitations. Under the independent reading, it would not. Williams Decl. at ¶¶ 80-82. The specification does nothing to resolve the confusion. It describes FIG. 4 as "a process for keeping track of multiple other wireless devices," '968 Patent, 5:49-50, and describes how "a person, such as a group leader at device 100-1, can keep track of a group of people, much as an air traffic controller keeps track of a plurality of airplanes," *id.* at 6:9-12, language appearing to refer back to the claim 1 method although described in terms of the people carrying the devices.

The defect is beyond judicial repair. A district court may correct a patent only where the error is evident from the face of the patent and the correction is "not subject to reasonable debate based on consideration of the claim language and the specification," and only where "the prosecution history does not suggest a different interpretation." *Novo Indus.*, 350 F.3d at 1357. Plaintiff may respond that the prosecution history shows application claim 43 was always presented with its own steps, so "The" should simply be read as "A." But evidence residing in the prosecution history alone cannot authorize judicial correction. The error and its fix must be evident from the patent itself. *H-W Tech.*, 758 F.3d at 1333-35. And the face of the '968 Patent points in both directions at once. Nor does the prosecution history support any such argument from Plaintiff. The preamble appeared in claim 43's first presentation on June 20, 2008 and survived numerous successive claim listings without the applicant or the examiner ever correcting it. An error that neither the drafter nor the USPTO noticed through several revisions is not one whose correction is "not subject to reasonable debate." Because claims 5 and 6 depend from claim 4, they fall with it.

### C. "continuously generates an ETA" - claim 7

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No construction necessary. | Lacks enablement/written description |

Claim 7 closes with the requirement that "said code *continuously generates* an ETA for said selected mobile device to converge with said master mobile device." '968 Patent, 8:49-51 (emphasis added). The word "continuously" appears nowhere in the specification. It was added to the claims for the first time on December 5, 2008, nearly six months after the filing date, in new claim 52, reciting "a process for continuously generating an ETA." A limitation introduced by post filing amendment must find written description support in the disclosure as originally filed. This one cannot.

Every ETA disclosure in the specification is discrete, optional, and conditional:

> Optionally, process 304 determines if the two devices are converging. If they are converging, then an ETA is calculated, if desired, via process 305 and communicated to the user of device 100-2, and if desired to the user at device 100-1. If the devices are not conversing [sic] then, if desired, an ETA could be established to a destination established by the calling device.

'968 Patent, 5:15-21 (emphasis added).

The only other ETA disclosure is a single conditional display: "In one embodiment, when the sending device is converging on the receiving device, the receiving device can display the ETA of the sending device." *Id.* at 1:60-63. FIG. 3 likewise shows a single "CALCULATE ETA" process box. The sole temporal update mechanism disclosed anywhere in the patent is expressly *periodic* and *serial*, and it governs position gathering, not ETA generation: "Process 406 controls the elapsing of periodic time intervals after which process 407 establishes connections, either all at once in conference style or, preferable serially, to each of the targets." *Id.* at 5:64-6:1. Periodic connection teardown and reestablishment is the opposite of continuous generation. The closest word the specification uses is "continually," but it describes a user granting permission for a device "to continually send updates of his/her device's position to the selected other devices," *id.* at 1:51-53. Repeated *position* transmissions by the sender, not ETA generation by the claimed code, and "continually" (recurring) in a different context is not "continuously" (uninterrupted). Nothing in the original disclosure reasonably conveys that the inventors possessed, in 2008, let alone in 2005, code that continuously generates ETAs. Williams Decl. at ¶¶ 70-75.

The specification also fails to teach a POSITA how to practice the full scope of the limitation without undue experimentation. *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). The '968 Patent discloses no update rate, no circumstances under which ETA is recomputed, and no architecture that would allow the ETA to be "continuously" computed. Instead, the disclosed embodiment tears down and serially re-establishes its links at periodic intervals. Truly *continuous* generation (an ETA at every instant) is not something discrete digital code executing sequential

instructions can do at all, so the literal scope of the claim is inherently non-enabled. Williams Decl. at ¶¶ 70-75.

Plaintiff's "no construction" position creates a problem that the intrinsic record cannot resolve. Either "continuously" has its plain, literal meaning (uninterrupted generation), or it means something less than continuous, and the patent supplies no objective boundary for how much less. There is no disclosure of whether "continuously" means, for example, once per second, once per minute, or only upon each periodic reconnection of process 406. The specification, which never uses the word, provides a POSITA with no way to know where recurring calculation ends and "continuous" generation begins. A term of degree without any objective boundary in the intrinsic record is indefinite. *Interval Licensing*, 766 F.3d at 1370-71; *Nautilus*, 572 U.S. at 901.

### D. "geographical positional data" / "said geographical positions" and "a plurality of mobile devices" / "said plurality of other mobile devices" - claim 7

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No construction necessary. | Indefinite |

"Said geographical positions" has no antecedent basis. What the claim previously recites is "geographical positional *data*," and the specification treats data and positions as two different things. It defines received data as merely *pertaining to* location, stating "In the context of this application, GPS data is data pertaining to the current location of a device without regard to how that location was determined." '968 Patent, 5:8-11. And it teaches that positions are *computed from* that data after receipt, explaining "Process 303 uses the received GPS data to calculate the position of device 100-1." *Id.* at 5:14-15. Under the specification's own explanation, positions are never received. Only data is received, and then positions are calculated.

The display limitation of claim 7 nonetheless requires displaying "*received ones* of said geographical positions." A POSITA is left with two materially different readings. Either the claim

requires receiving positions as such (for example, coordinates), something that is not disclosed by the specification, or it covers receipt of any data derivable from position (*e.g.,* cell tower records, third party feeds), which reads "positions" out of the display limitation entirely. The phrase "received ones of" compounds the confusion, implying a distinction between received and non-received positions. But the claim supplies no way to understand when the reception element receives only "data." The mismatch has been present since these limitations were first added on December 5, 2008 and was never corrected through any subsequent amendments. The two readings produce different infringement boundaries, and the intrinsic record provides no basis to choose between them. Williams Decl. at ¶¶ 83-85. The term is indefinite. *Nautilus*, 572 U.S. at 901.

Regarding the plurality of mobile devices limitation, the first limitation of Claim 7 recites data "relating to *a plurality of mobile devices*," its second limitation recites positions "of *said plurality of other mobile devices*," and its third limitation sends data to "a selected one of *said other mobile devices*." '968 Patent, 8:35-45 (emphasis added). The word "other" appears without introduction. No first set of mobile devices is ever recited from which the second limitation devices could be "other."

One possibility is that "other" means other than the master, but the master is itself recited as a "master *mobile device*," so the first limitation's "plurality of mobile devices" can include the master, whose own position is inherently relevant to the recited convergence data. That provides two contradictory readings: (i) "said plurality of other mobile devices" is the *same* set as the first limitation's plurality, in which case "other" is unnecessary and the master is excluded from the first limitation; or (ii) it is a *different*, unrecited set that excludes the master, in which case "said" has no antecedent basis. Every downstream limitation, including "a selected one of said other mobile devices" and "said selected mobile device," relies upon the ambiguous limitations.

Whether an accused system that also tracks the master device depends on which reading governs. Williams Decl. at ¶¶ 86-89.

The specification does not provide any clarity because it teaches that the master/target roles themselves are interchangeable. The system "can work in the reverse or by using a combination of directional initiations." '968 Patent, 6:21-27. The prosecution history also fails to shed any light on the ambiguity. The mismatch was present in claim 47 as introduced on December 5, 2008 and issued uncorrected. The faulty claim drafting is underscored by the fact that duplicate claims 49 and 50 issued as claims 9 and 10. An intrinsic record that makes every device a potential master provides no way for a POSITA to understand which device falls within the "other" set. The term makes it impossible for a POSITA to determine the boundaries of the claim, and thus it is indefinite.

### E. "code for controlling" and "code for causing" - claim 7

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No construction necessary. | Indefinite |

Although the limitations do not use the word "means," that omission carries only a rebuttable presumption that it does not invoke 35 U.S.C. § 112, ¶ 6. *Williamson*, 792 F.3d at 1348-49. The question is whether the claim recites sufficiently definite structure for performing the claimed functions, but it does not. The word "Code," standing alone, is a generic descriptor of software and does not invoke structure any more than the word "module" held to invoke ¶ 6 in *Williamson*. *Id.* at 1350-51. The claim recites no programming language, no data structures, and no description of how any "code" operates or interacts with other components. Each limitation is recited functionally ("controlling a reception," "controlling said master mobile device to display," "causing said master mobile device to send") with "code for" substituted for "means for." A

POSITA would not understand "code for controlling a reception" to connote any definite structure. Williams Decl. at ¶¶ 90-91.

The prosecution history confirms this understanding. These limitations were filed on December 5, 2008 as "An application . . . comprising *processes for*" receiving, displaying, and sending. Ex. 4, September 21, 2009 response at pg. 4 (strikethroughs showing deletion). When the USPTO rejected them under § 101 as "purely software," the applicant relabeled the same functions, explaining that "in the interest of obtaining an allowance, Applicant has amended claims 47-52 to include a positive recitation of the code that controls the application." *Id.* at pg. 7. The word "code" was thus adopted as an attempt to overcome the statutory subject matter rejection. By the applicant's own admission, it is a "recitation of the code," not of any structure for performing the functions. Notably, Plaintiff's own proposed constructions identify purported corresponding structure for "means for" limitations in four of its other asserted patents yet insist that the '968 Patent's functionally identical "code for" limitations require no construction and identify no structure for them. Functional claim language does not escape 35 U.S.C. § 112, ¶ 6 because the drafter wrote "code" where Plaintiff's other patents say "means."

Once 35 U.S.C. §112, ¶ 6 applies to a computer implemented function, the specification must disclose an algorithm for performing each claimed function. A general-purpose computer, or a restatement of the function, is insufficient. *Aristocrat*, 521 F.3d at 1333; *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1383 (Fed. Cir. 2009). The '968 Patent's specification is devoid of any of these details. The word "algorithm" never appears, and the only occurrences of "code" in the written description are an "access code," "protocol codes," and roadway "bar codes." The flowcharts of FIGS. 3 and 4 display labeled boxes ("process 305," "calculate ETA") at a high level of generality, and no algorithms are disclosed. *Blackboard*, 574 F.3d at 1383-84

(specification that "describes an outcome, not a means for achieving that outcome" discloses no algorithm). The specification also mirrors this generality, by disclosing a general processor that *Aristocrat* holds insufficient: "Processes 20, 30 and 40 would be designed to work as applications running on a processor within a mobile device, such as a cell phone." '968 Patent, 6:28-30.

With no corresponding structure disclosed, the "code for controlling" and "code for causing" limitations are indefinite, and claim 7, together with claims 8-10 which depend from it, is invalid.

## X. The '388 Patent Disputed Terms

### A. "means for determining a channel estimate" – claim 43

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Subject to 35 U.S.C. §112(6):<br>**Function**: determining a channel estimate<br>**Structure**: Part of the receiver, which includes ADC 2002, split band filter 2004, legacy sensing circuits 2006 and 2008, LTS correlator and detector 2012, processor, and channel estimation circuits as taught in the specification and understood by one skilled in the art (see '388 patent: Fig. 20, 8:17-18, and 11:4-22). | Not enabled/Indefinite |

Claim 43 is a single-element means-plus-function claim – which is invalid for lack of enablement. "The final paragraph of § 112 saves *combination* claims drafted using means-plus-function format from this problem by providing a construction of that format narrow enough to avoid the problem of undue breadth as forbidden by the first paragraph. *But no provision saves a claim drafted in means-plus-function format which is not drawn to a combination, i.e., a single means claim*." *In re Hyatt*, 708 F.2d 712, 715 (Fed. Cir. 1983) (emphasis added).

"To determine whether a claim is single-means, courts look to the claim language and analyze whether it claims multiple elements of an invention." *Immervision, Inc. v. Apple Inc.*, 819

F. Supp. 3d 338, 344 (D. Del. 2026). Claim 43 clearly fails this test. Claim 43 merely recites "means for determining a channel estimate for a transmission channel based on a composite packet received on the transmission channel." '388 Patent, claim 43. Thus, the problem with claim 43, and with single-element means-plus-function claims generally, is that "a single means claim is that it covers every conceivable means for achieving the stated result, while the specification discloses at most only those means known to the inventor." *Hyatt*, 708 F.2d at 714. Thus, claim 43 is invalid as failing to enable all the conceivable means that it covers.

Additionally, claim 43 is indefinite as the claim element requires a disclosure in the specification and drawings requiring definition of a structure and an algorithm to perform the recited channel estimate. However, the specification and drawings do not specify a structure and an algorithm to perform a channel estimate. Haas Decl. at ¶¶ 29-32. A channel estimate could be performed in different ways using different algorithms, so a bare disclosure of alleged "channel estimation circuits" does not teach the structure or algorithm used at all. It simply repeats the function. *Id*. at ¶31. Furthermore, a channel could be estimated based on different parameters, using different structure and different algorithms, none of which are set out in the specification of the '388 Patent. Because the specification fails to disclose what algorithm does and does not provide the recited function, one of ordinary skill would not know what algorithms infringe. *Id*. at ¶32. Claim 43 is thus indefinite.

### B. "channel estimation circuitry configured to determine a channel estimate" - claim 36

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| No construction necessary. | Not enabled/Indefinite |

Like claim 43, claim 36 is a single-element means-plus-function claim – which is invalid for lack of enablement. Defendant incorporates its arguments made with respect to claim 36. While

"channel estimation circuitry" does not recite the word "means," the use of the word "circuitry" does not sufficiently connote any structure or algorithm by itself. Haas Decl. at ¶¶ 33-36.; *see also Williamson*, 792 F.3d at 1349 (Fed. Cir. 2015) ("The standard is whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure. When a claim term lacks the word 'means,' the presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" (internal quotation marks and citation omitted). That failure to connote structure or an algorithm rebuts the presumption that "channel estimation circuitry" is not a "means-plus-function" claim element. Like with claim 43, claim 36 is invalid as failing to enable all the conceivable means that it covers.

Additionally, claim 36 is indefinite as the claim element requires a disclosure in the specification and drawings requiring definition of a structure and an algorithm concerning channel estimation circuitry configured to determine a channel estimate. However, the specification and drawings do does not specify a structure and an algorithm to determine a channel estimate. Haas Decl. at ¶¶ 29-32. A channel estimate could be determined in different ways using different algorithms. *Id.* at ¶ 35. Furthermore, a channel estimate could be determined based on different parameters, using different structure and different algorithms, none of which are set out in the specification of the '388 Patent. *Id.* at ¶¶ 35-36. Claim 36 is thus indefinite.

## XI. The '153 Patent Disputed Terms

### A. "an SVD performer" – claim 28

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| No construction necessary. | Indefinite |

While "SVD performer" does not recite the word "means," the word "performer" is not a

word with an understood structure or meaning in the field of wireless communications, and it does not sufficiently connote any structure or algorithm by itself. Haas Decl. at ¶¶ 37-42. Further, the word is being used by the patentee as an equivalent filler word to "means" and thus subjects this term to means-plus-function requirements. The specification provides no support for what this word means, with "performer" not appearing in the specification to help those of ordinary skill in the art understand its meaning. *Id*. at ¶¶ 38-40. That failure to connote or disclose structure or an algorithm rebuts the presumption that "SVD performer" is not a "means-plus-function" claim element.

Further, "an SVD" or "singular value decomposition" lacks support or definition in the specification as well. *Id*. at ¶¶ 39-40. The specification of the '153 Patent does not provide the required algorithm or structure to perform a SVD calculation. As noted by Dr. Haas, a SVD could be performed in different ways using different algorithms. *Id*. Furthermore, to some degree, an SVD is not unique; although the singular values and the singular subspaces are unique, the singular vectors are not (due to possible sign flips and rotations). *Id*. at ¶ 40. Indeed, the claim language of element 28[a] refers to "performing ***an*** SVD of an estimated channel matrix …" (emphasis added), alluding to the fact that an SVD is not unique. *Id*. at ¶ 41. The recitation of SVD in claim 28 is thus indefinite.

## XII. Conclusion

For all the foregoing reasons, IntelliShift respectfully asks this Court to adopt IntelliShift's proposed constructions for each term discussed above.

DATE: July 13, 2026

Respectfully Submitted,

/s/ Siddhesh V. Pandit
Siddhesh V. Pandit, VA Bar No. 75,686 (*pro hac vice*)
svp@maierandmaier.com
Timothy J. Maier, VA Bar No. 46,354 (*pro hac vice to be submitted*)
tjm@maierandmaier.com
Michael R. Casey, VA Bar No. 43,919 (*pro hac vice*)
mrc@maierandmaier.com

**MAIER & MAIER PLLC**
345 South Patrick Street
Alexandria, VA 22314
(703) 740-8322 (phone)
(703) 991-7071 (fax)

Thomas J. Gohn
(TX Bar No. 24097742) (*pro hac vice*)
tjg@maierandmaier.com

**MAIER & MAIER PLLC**
8750 N. Central Expressway
Suite 1850
Dallas, Texas 75231
(703) 740-8322 (phone)
(703) 991-7071 (fax)

Ari J. Jaffess
Alex G. Patchen
**LISTON ABRAMSON LLP**
The Chrysler Building
405 Lexington Avenue, 46th Floor
New York, NY 10174 Tel: (212) 257-1630
Email: docket@listonabramson.com

***Attorneys for Defendant Vehicle Tracking Solutions, LLC d/b/a IntelliShift***